Filed 1/24/14  Marriage of Aitchison CA1/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIRST APPELLATE DISTRICT

### DIVISION TWO

| | |
|---|---|
| In re the Marriage of GRACE AITCHISON and DAVID AITCHISON. | |
| GRACE AITCHISON,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>DAVID AITCHISON,<br><br>        Defendant and Respondent. | A134450<br><br>(Contra Costa County<br>Super. Ct. No. MSD09-05412) |

"[T]he parties appear in this case to me to be in a position of both trying to achieve exsanguination of the other side.  Death by a thousand paper cuts until there is no money left . . . ."  So astutely observed the Honorable Charles Burch during the trial of this marital dissolution case.  While, sadly, this is often true in divorce cases, it is particularly so here, where former spouses David and Grace Aitchison incurred more than $1.5 million in attorney and expert witness fees in their fight over property division and support after the demise of their 22-year marriage.  At the end of the day, after having rejected two very generous settlement offers by David, Grace was left with a share of the modest community estate, while David retained his substantial separate property.[1]

---

[1] As is frequently done in cases involving spouses, and to avoid confusion, we refer to the parties by their first names.  We intend no disrespect in doing so.

1

Grace appeals, asserting that the trial court erred in the following three particulars: (1) finding that David did not transmute much of his separate property into community property; (2) failing to award her adequate attorney's fees; and (3) sanctioning her for filing a writ petition. David cross-appeals, claiming that the trial court erred in finding the couple's premarital agreement unenforceable.

We affirm.

## BACKGROUND

### Marriage and Separation

David and Grace met in college in 1981 and married six years later. On November 13, 2009, Grace filed a petition for separation. David responded with a request for dissolution of the marriage. At the time of separation, the couple had two minor children and two adult children.

### The Aitchison Family Business

David came from a family of considerable wealth that derived from a business called Tharco Sales Company (Tharco), a cardboard cartons business founded by his grandparents. Over the years, David's father and uncle helped operate and grow Tharco and other related companies into a significant enterprise.

From a very young age, David, his two siblings, and his two cousins were gifted shares in the Tharco companies. These gifts continued as David grew up, as a result of which he owned a sizable portfolio of Tharco stock.

Then, in early 1987, not long before his marriage to Grace, David agreed to purchase additional shares of Tharco stock from his siblings and cousins. He executed a promissory note for the agreed-upon purchase price of approximately $426,500.

### Premarital Agreement

Shortly before David and Grace married, David's father, James, suggested to David that he and Grace enter into a premarital agreement to protect the family business and his separate assets. David was amenable, so James contacted Herman Scampini, long-time attorney of the Aitchison family, who in turn worked with David to prepare the agreement.

2

David and Grace signed the resulting agreement on April 22, 1987. As pertinent here, it identified the amounts David owed his siblings and cousins for the Tharco stock as his separate obligation. Per paragraph 2, if community property was used to satisfy his separate obligations, those amounts would be treated as a loan from the community, entitling it to reimbursement at a rate of 12 percent interest.

The evidence concerning the circumstances under which Grace executed the agreement was conflicting. David testified that he and Grace discussed the agreement; he suggested she have an attorney review it and left it for her on his kitchen table; and she gave him a signed copy several days later.

According to Grace, the first time she saw the agreement was the night before she and David were to leave for their wedding. They were having dinner at his parents' house, and David and James presented it to her there. Grace testified that she did not know what a prenuptial agreement was, but they assured her it was "no big deal" and that it had to do with voting shares of Tharco. She then signed it without reading it. At trial, Grace did not recall anyone suggesting she have an attorney review it.

Grace further testified that she trusted David as well as James, with whom she was closer than her own father. She and David did whatever James told them to do.

James denied presenting the agreement to Grace the night before she and David flew out of town for their wedding. He further denied that Grace signed the agreement in his presence or that he ever talked to her about it.

**"Gross Up" Arrangement**

David's debt to his siblings and cousins for the Tharco stock remained outstanding, so in 1988, James—who by then was the president of the company—devised an arrangement that would allow David to retire the debt. He "grossed up" David's salary, essentially tripling it for purposes of his paystubs and W-2 forms. The company withheld the additional money, however, sending it directly to David's relatives. By 1993, David's debts were paid off, and the additional payments were discontinued. James did not consider the gross-up funds compensation to David as a Tharco employee, but rather a gift.

**Sales of Tharco Stock**

In 1998, and again in 2005, the Aitchison family sold its shares in the Tharco companies, with David reaping in excess of $10 million in the two transactions. With his proceeds, David made a down payment on a family home in Danville and bought a ranch in Burney, among other things, putting the remainder in various investment accounts.

**The Aitchison 2000 Family Trust**

Meanwhile, on February 28, 2000, David and Grace entered into a trust agreement, again prepared by attorney Scampini, for purposes of creating The Aitchison 2000 Family Trust, which they amended nine months later. Certain provisions of the trust agreement are relevant to Grace's claim that David transmuted the majority of his separate property to community property. Specifically:

Article I, paragraph 1.1 identified the purpose of the trust as follows: "This Trust has been established by the Settlors for the purpose of convenience in the management and disposition of their respective interests in the property which they have previously transferred or are going to transfer to this Trust. It is the Settlors' intention that any community property which has been transferred to this Trust and the proceeds and increase thereof shall retain the character of and continue to be their community property and that any separate property that has been or will be transferred to this Trust by a Settlor shall retain the character of and shall continue to be the separate property of the contributing Settlor."

Paragraph 1.2.1 read: "The Settlors declare that the property which they have previously conveyed or are now conveying to this Trust, all as set forth on Schedule A attached hereto, was before the transfer to this Trust, and shall remain after said transfer, as their community property and that said community property, together with any additional community property that may be transferred to the Trust by the Settlors (herein 'Settlors' Community Estate' or 'SCE') shall (notwithstanding the transfer to this Trust) remain as the community property of the Settlors during their joint lifetime."

Paragraph 1.2.2, entitled "David's Separate Estate," provided: "The Settlors declare that the property described in Schedule B was before the transfer to this Trust,

4

and shall remain after said transfer, as DAVID's separate property, and that said separate property, together with any additional separate property that DAVID may hereafter transfer to the Trust (herein 'DAVID's Separate Estate' or 'DSE') shall (notwithstanding the transfer to this Trust) remain as DAVID's separate property so long as DAVID shall live."

Schedule A, entitled "Settlors Community Estate," provided: "The undersigned, have either previously assigned, and or do hereby assign, transfer, bargain, sell and or convey to David T. Aitchison and Grace F. Aitchison, Trustees of The Aitchison 2000 Family Trust, dated February 28, 2000 ('said Trust Agreement'), all of their right, title and interest in and to the following assets, said assets consisting of the undersigned community property, and which shall comprise the Settlors' 'Settlors Community Estate' or 'SCE', as that term is defined in said Trust Agreement." A number of assets were then listed, including all personal articles belonging to David and Grace, shares in Tharco and other entities, certain investment accounts (including what would be referred to in the litigation as the Wells Fargo Schedule A account), and the Danville house.

Schedule B, entitled "David's Separate Estate," assigned to the trust David's separate property interest in an investment account and stock in one of the Tharco businesses.

### Dissolution Proceedings

As noted, Grace petitioned for separation from David in November 2009, and David responded with a request for dissolution. From the outset, Grace was represented by attorney John Manoogian, David by attorney Bridget Bank, with both attorneys remaining in the case through the end of what would become a long and contentious trial.

### Grace's First Request for Pendente Lite Attorney's Fees

In early December, Grace filed a request for, among other things, $50,000 for attorney's fees, $75,000 for accounting expert Jeffrey Stegner, monthly spousal support of an unspecified amount, and exclusive use of the family home. Alternatively, she requested that "all liquid accounts be disclosed and divided" and that she be granted control over half of the liquid funds in the community estate. In a supporting declaration,

5

she estimated the couple's net worth to be between five and 10 million dollars, with a monthly cash flow exceeding $60,000.

On February 3, 2010, David responded to Grace's request, disputing her estimates of their income and assets. He represented that they in fact had no monthly income because their two community property businesses were not profitable and their community accounts totaled $74,000, which he proposed be divided equally. According to David, the remainder of the accounts belonged to their children or were his separate property. He proposed that he and Grace each receive a distribution of $100,000 from the Wells Fargo Schedule A account as a preliminary distribution of community property pending the division of assets.

Around the same time, David also extended to Grace what can easily be described as a very generous settlement offer. She did not, however, promptly respond.

**Grace Receives $100,000 Distribution**

On February 19, 2010, Grace's motion for fees and temporary support came on for hearing before the Honorable Susanne Fenstermacher. Per David's suggestion, Judge Fenstermacher ordered a $100,000 distribution to Grace, reserving the characterization of it and setting Grace's motion for a second hearing on May 28.

Before the matter was heard, the parties' accountants both filed declarations regarding the couple's finances. Grace's accountant Stegner estimated the couple's average annual income to be $1,018,814, based upon their jointly filed federal income tax returns for the years 2006, 2007, and 2008. According to Stegner, the total balance of bank accounts as of December 31, 2009 was $4,231,652.

David's accountant, Stephen Nunnemaker, provided a starkly contrasting view. According to Nunnemaker, the income levels in 2006 through 2008 were not determinative of the income in 2009 or 2010. This was due, in large part, to disbursements made to David from various separate property interests that would not be duplicated in 2009 and 2010. Instead, Nunnemaker represented that the couple lost $706,637 in 2009, and he estimated a loss of $251,028 for 2010.

David and Grace appeared at a settlement conference before Judge Fenstermacher on April 27, 2010. Grace still had not responded to David's three-month-old settlement proposal, and the case did not settle. At Grace's request, Judge Fenstermacher scheduled another settlement conference for July, also setting the case for trial on September 20 through 24, 2010 based on a five-day estimate for trial. To encourage settlement before that date, she ordered David to produce by July 1 a tracing supporting his claim that much of the parties' marital estate could be traced to his separate property.

**Grace Is Awarded $75,000 In Attorney's Fees**

On May 28, 2010, the parties appeared before Judge Fenstermacher on Grace's request for attorney's fees and temporary support. There ensued a lengthy discussion concerning the community assets available for pendente lite fee and support awards to Grace, much of which focused on the Wells Fargo Schedule A account that at the outset of the dissolution proceeding contained approximately $1.4 million dollars. According to David's attorney Bank, the account contained David's separate property and was not liquid, as it served as collateral for a line of credit. On the other hand, attorney Manoogian contended that the trust identified the account as a community asset and that Grace should have joint control over it. After extensive debate, Bank asked the court to set a date for a hearing to determine whether the 2000 trust documents had transmuted David's separate assets, including the Wells Fargo account, into community property. After asserting that "that's not an appropriately bifurcated issue," attorney Manoogian made the following representation: "We're not alleging that the trust is a transmutation. It doesn't say it's a transmutation. Before there can be a transmutation, there has to be separate property or community property being transmuted to separate. We're not alleging that now. We don't have enough information to even allege that. [¶] . . . [¶] . . . I'm not claiming this is a transmutation, doesn't say it's a transmutation." Based on Manoogian's representation that the trust agreement was not a transmutation document, Judge Fenstermacher denied Bank's request.

Judge Fenstermacher then ruled on Grace's fee request, ordering David to pay her $75,000. She further ordered David to pay $2,254 per month in child support and

7

$1,752 per month in spousal support, commencing on June 1, 2010.  She reserved Grace's request for accounting fees, and reiterated that David was to provide Grace with tracing documents on or before July 1, 2010.

**Settlement Efforts Fail**

In June 2010, Grace finally responded to David's January settlement offer, rejecting nearly every term and proposing her own, much more favorable package that ignored David's separate property claims.

The following month David provided his tracing information as ordered by the court.  It consisted of a 20-page declaration supported by voluminous financial records, which together provided extensive details concerning financial transactions that David claimed were traceable back to his separate property.

That same month, the parties appeared at their second settlement conference. Judge Fenstermacher proposed a settlement with which David reluctantly agreed.  Grace declined to respond to the offer at the conference, instead requesting a third settlement conference.

On July 26, 2010, the parties appeared for the third settlement conference, at which Manoogian presented Grace's latest settlement proposal—essentially a demand for half of everything.  Judge Fenstermacher deemed the proposal unreasonable, and David rejected it.

**Grace Deposes Attorney Scampini**

The day after the third and final settlement conference, Manoogian issued a deposition subpoena to attorney Scampini, instructing him to appear and produce "[a]ny and all legal work relating to estate planning, trusts, gifts, and/or financial planning done for David Aitchison or Grace Aitchisonas [*sic*] as individuals or as trustees, settlors, or beneficiaries."  In essence, Manoogian was seeking documents relating to the premarital agreement and the couple's trust.

A month later, Scampini appeared for his deposition.  He objected, however, as did David, to the production of certain of the documents requested and several of Manoogian's questions on the basis of the attorney-client privilege and the attorney work

8

product doctrine. According to Scampini and David, David alone—and not Grace—was Scampini's client.

**Grace Requests Liquidation of the Wells Fargo Account and a Continuance of the Trial Date**

Meanwhile, on August 9, 2010, Grace field an ex parte motion seeking control of half of the community funds in the Wells Fargo account, claiming she needed the funds to mount her case. She also requested a continuance of the September 20 trial date. In her request, Grace stated: "I am unable to pay my existing attorney or expert fees and am, therefore, unable to afford the cost of this litigation or prepare for trial. Moreover, I am unable to afford my daily living expenses. Since David and I separated, David has controlled the community funds and prevented me from any access to our accounts. I currently incur over $10,000 in monthly living expenses, but only receive $4,017 in support every month. I fear that if I am not allowed access to our accounts, David will have an unfair advantage and ability to prepare for trial, and I will not be able to afford my living expenses and attorney's fees. Moreover, I believe that David will continue to spend and encumber the accounts if he is allowed sole control of the accounts." In her supporting income and expense declaration, Grace represented that she had paid Manoogian $126,822 and owed him an additional $53,383. Of the amount paid to Manoogian, $27,983 had been paid to expert witness Stegner.

**David Retains Accountant Brian Boone**

As the trial date approached and with settlement efforts having failed, David retained accountant Brian Boone as a trial expert. David agreed to advance Grace the fees it would cost to depose him, totaling $9,931, and Manoogian deposed him on September 8, 2010. Boone brought with him a number of records, including extensive materials on which he was relying to form his opinions, and testified that he was still in the process of completing his analysis.

**The Court Denies Grace's Requests For a Distribution of the Wells Fargo Account and a Trial Continuance**

Judge Fenstermacher heard Grace's requests on September 14. She denied them both, specifically denying her request for distribution of funds on the ground that the character of the funds in the Wells Fargo account was one of the issues to be resolved at trial.

The following day, Grace filed her trial brief, stating that she was doing so "under protest based upon the failure of this court to allow sufficient community funds to be provided to [Grace] both for her own necessary monthly living expenses pendente lite, and for payment of necessary attorney's fees and court costs incurred in preparing this case for trial." Significantly, Grace asserted for the first time that the couple's trust agreement effectuated a transmutation of David's separate property into community assets, a claim in direct contradiction to Manoogian's May 28 representation to Judge Fenstermacher.

**Grace Files a "Motion in Limine" to Compel Further Discovery From Scampini**

On September 17, 2010, the court day before trial was set to start and well after the deadline for filing discovery motions, Grace filed a "motion in limine to compel production of documents," seeking an order requiring Scampini to produce the documents he withheld and answer the questions he refused to answer at his deposition. She argued that Scampini should not have been permitted to deprive her of discovery based on the attorney-client privilege because she, too, was his client.

David opposed the motion on multiple grounds: it was an improper tool to compel discovery; a proper motion to compel discovery was untimely; Grace did not meet and confer; and the requested information was protected by the attorney-client privilege. Scampini also opposed the motion, asserting essentially the same arguments as David, and specifically disputing he had an attorney-client relationship with Grace. According to Scampini, by Grace's own testimony, she had never gone to his office, signed a retainer agreement with him, requested that he perform any legal work on her behalf,

10

received any correspondence from him, or, as far as she recalled, even met him. Further, according to Scampini, he took all direction from David, never communicated with Grace, and generally received payments for his work from "one of the Aitchison business entities."

**Commencement of Trial and Judge Burch's Ruling That Grace Did Not Have an Attorney-Client Relationship With Scampini**

Trial commenced as scheduled on September 20, 2010 before Judge Burch. As will be seen, what was originally set for a five-day trial would turn into a 24-day trial, with evidence heard between September 23, 2010 and June 27, 2011.

The first day of trial, Judge Burch heard argument on the Scampini motion, agreeing to decide it on the merits since the issues would require resolution before or during trial anyhow. As the ensuing argument would make clear, the key issue involving Scampini was a letter he wrote to David on November 7, 2000 (just three weeks before Grace and David signed the amended trust) advising that "As a result of your decision to convert a substantial portion of your assets to community property, it is necessary to amend The Aitchison 2000 Family Trust, since at the time that trust was initially drafted, Grace had a nominal estate." He represented that the assets in Schedule A included "the community property assets that were previously conveyed to the trust by you and Grace, as well as the additional assets that you are converting to community property . . . ." He then went on to describe to David the steps he needed to take to amend the trust.[2] The letter would become the centerpiece of Grace's claim that David transmuted his separate property into community property, and its admissibility would remain hotly contested throughout the entire trial.

After lengthy argument, Judge Burch ruled that Grace did not have an attorney-client relationship with Scampini and was thus not entitled to discover privileged communications between him and David. Although Judge Burch declined to

[2] The letter was copied to David's then accountant, who produced it to Grace in response to a document demand.

11

rule that Scampini's November 7, 2000 letter was inadmissible for any purpose, he expressed skepticism that the letter was admissible for the purpose for which Manoogian wanted to use it. And he ruled that Grace could still call Scampini as a witness at trial, as he could testify about matters not protected by the attorney-client privilege.

Testimony began on September 23, with Manoogian first calling Scampini to the stand. During his examination, Manoogian attempted to elicit testimony about the November 7 letter, prompting an objection from Scampini's counsel. After lengthy argument, Judge Burch sustained the objection, ruling that the letter was not admissible for any of the purposes for which Manoogian sought to introduce it—most significantly, the legal effect of the trust documents.

### Judge Burch Finds the Trust Agreement Did Not Transmute David's Separate Property into Community Property

Following Scampini's testimony, Manoogian called David as the next witness. His testimony consumed much of the remainder of the day, at the conclusion of which there was further discussion about the transmutation issue. Manoogian then asked Judge Burch "to make a finding" on whether the trust documents effected a transmutation of David's separate property. Judge Burch suggested that counsel submit any authority regarding whether extrinsic evidence was admissible on the transmutation question or whether he was confined to the four corners of the trust agreement. He then recessed for the day.

The session the next morning commenced with Judge Burch "mak[ing] sure exactly what you both think I should be doing here this morning." He represented that the prior day, both parties thought it appropriate for him to decide at that point whether the trust documents effected a transmutation of David's separate property. Manoogian responded that, subject to Judge Burch's evidentiary ruling concerning Scampini's letter, "we have no problem with the court addressing this issue now." Bank agreed. Judge Burch then found that there was no transmutation, going on to provide a detailed, 17-page explanation for his ruling. Testimony then resumed, and at the end of the day, trial was continued to November 8.

12

**Grace Files Another Request For Fees**

Ten days later—October 4—Grace filed another request for fees, this time seeking attorney's fees of $250,000 and expert costs of $75,000.[3] She also repeated her request for control over half of the Wells Fargo Schedule A account, again contending it was community property. According to the request, as of the first day of trial, Grace had paid her attorneys $143,267 and owed them $85,875, an amount that had grown to $105,000 by the time of the fee request. She had paid Stegner $27,983 and owed him $20,775, and he estimated incurring an additional $10,000 in fees for trial. In her supporting points and authorities, Grace represented that David had paid his attorneys in excess of $287,000, plus undisclosed sums to his accountants.

Judge Burch heard Grace's motion on November 8, 2010, ordering David to pay Grace $75,000 for fees but denying her request for control over the Schedule A account. When Manoogian protested that he was already owed $105,000, an amount that did not include fees owed to Grace's experts, Judge Burch responded that $75,000 should see Grace through trial. When Manoogian pressed his objection, pointing out that David had already he paid his attorneys $293,000 with another $44,000 outstanding, Judge Burch countered: "If your idea is I have got to right now bring you back to square one in terms of your outstanding fees I think you are absolutely wrong. $75,000 is certainly enough money to float your wiggle fees between now and the end of the case."

When Grace received the funds from David, she retained $11,000 for her personal expenses, with the balance going to Manoogian.

**Trial Testimony Continues Before a Two-Month Hiatus**

Further evidence was heard on November 30, December 1, 2, 3, and 7, with additional testimony from David, as well as from Grace and a few other witnesses, including accountant Stegner. David's forensic expert Boone was to be the next to testify on December 8. Two days prior to his testimony, he gave Bank an updated tracing on

---

[3] Elsewhere in her request, Grace asked the court to order David to pay her attorneys "sums equal to those demanded by his own attorney's [*sic*] on an ongoing basis until this litigation is complete."

13

which he intended to rely at trial; Bank, in turn, gave copies to Manoogian. For various reasons, however, Boone did not testify as scheduled, and trial was continued to February 14, 2011.

During the hiatus, Stegner met with Boone on December 16, 2010 to review the updated schedules. And on January 24 and 26, 2011, Manoogian further deposed Boone.

**Grace Files Another Request for Attorney's Fees and Costs and Receives $15,000 From David**

Meanwhile, on December 30, 2010, Grace filed another request for attorney's fees and costs, this time seeking $316,868. She also sought to increase child support to $6,000 per month and spousal support to $9,500 per month.

Judge Burch heard argument on Grace's fee request on January 10, 2011. By order dated January 13, 2011, he ordered David to pay Grace $15,000, subject to later characterization. In his lengthy and thoughtful order, Judge Burch observed "that the costs of this litigation seem out of proportion to the size of the assets being contested," but that "to the extent that David's attorney's fees and costs are substantially greater than Grace's, this may be in large part due to expenses associated with his satisfying his burden of proving that assets can be traced to his separate property. So far, the evidence suggests a rather complex picture of financial interests and transactions involving David's father and brothers and their family business. The evidence suggests to date that David and his counsel are spending significant resources so as to permit him to meet his burden of proving his separate property claims. The court does not have the sense, and Grace did not provide any specific information that it was necessary for Grace to expend equal amounts to challenge David's proof of the tracing of his assets."

Judge Burch further stated that Grace had already been awarded substantial amounts both before and during trial. And other than the evidence about the Wells Fargo accounts, he had heard little evidence indicating that David possessed other assets or income that was available to pay Grace's litigation costs. Judge Burch opined that it was

the goal of Family Code section 2030[4] to allow each party sufficient resources to adequately pursue the litigation to a conclusion. He noted that case law referred to leveling the playing field, but he did not understand that to obligate him to make pendente lite fee awards "to insure that each party at all times has the exact same amount of funds to pursue the litigation." It was also not the court's role, he stated, to assist the parties in exhausting all of their resources on attorney's fees. He concluded: "In deciding on an appropriate amount of fees to be awarded, this court believes that it must be mindful that guaranteeing that both sides will always have the exact same resources to pursue litigation may, in some cases, give an incentive to a party to litigate all or a part of a case that should be settled. [¶] In this case, Grace previously has been provided ample funds which, in this court's view, were probably sufficient to get her through the trial of this case. Given the complexity of the evidence in this case, the court cannot say with certainty that Grace and her attorney have abused the largesse of the court by already using up the fee awards previously ordered pendente lite. [¶] However, the court does not believe that it is appropriate to grant counsel's request for more than $250,000 in additional fees to be charged to David. In addition to being a huge amount to expend on attorney fees in just about any case, this amount would constitute one-third or more of all the liquid funds currently available to both parties."

### Grace Files Another Request for Attorney's Fees and Costs

On February 3, 2011—a mere three weeks after Judge Burch's January 13 order—Grace filed yet another request for attorney's fees and costs, this time asking for attorney's fees of $250,000 and costs of $75,000, as well as equal distribution of cash in community accounts, including the Wells Fargo Schedule A account. She stated that she was filing the motion "as the result of JUDGE BURCH's refusal to address the previously filed Motions" seeking control of community assets.

David opposed Grace's request, noting that he had already paid her over $200,000 for her fees, plus an additional $100,000 for her living expenses as well as court-ordered

---

[4] All undesignated statutory references are to the Family Code.

temporary support. As to Grace's request for control over accounts pending trial, David asserted there was insufficient community property to make the division Grace requested and to reimburse him if the court determined that the Wells Fargo funds were David's separate property.

### Grace Moves to Continue the Trial and Reopen Discovery

On February 8, 2011, with trial scheduled to recommence on February 14 and conclude on February 18, Grace moved to continue the trial and reopen discovery. She argued that if the court were to permit Boone to testify and introduce a new tracing he had prepared, she needed to conduct discovery of him, as well as of Scampini, whose files had been made available to Boone and in part formed the basis of his opinions.

Grace's request for a trial continuance was also based on her having suffered, as she described it to Manoogian, a "total melt down" that led to her commitment to a residential facility for treatment of substance abuse issues and related posttraumatic stress syndrome. She expected to complete the initial 30-day program on February 12, but her therapist recommended that she remain in treatment for an additional 30 days, which would place her discharge date well beyond the February 14 trial date.[5]

David opposed Grace's requests, pleading with the court to allow the trial to resume on February 14 as scheduled: "[Grace] and I desperately need to conclude the very expensive litigation in our divorce. We desperately need this Court's final determination of the character and division of property, as well as final support orders. Any further delay in obtaining final orders in our divorce will only serve to increase our attorney's fees." David also argued there was no basis "whatsoever" for reopening discovery, citing Grace's request as "just the most recent example of her sanctionable conduct."

---

[5] The same day Grace filed the motion, David was granted sole legal and physical custody of their minor children due to Grace's substance abuse problems.

16

Following a hearing on February 14, Judge Burch granted Grace's motion to continue the trial, ordering that it would recommence on March 28, 2011, but denied her request to reopen discovery. Her fee request was set for hearing on February 28, 2011.

Grace's fee request came on for hearing as scheduled, at the conclusion of which Judge Burch issued an order directing David to pay Grace $4,006 per month for temporary spousal support. He also ordered David to pay $10,000 to Stegner upon receipt of a written commitment that he would testify at trial; if such commitment was not forthcoming, David was not obligated to pay him.

**Grace Attempts to Substitute Manoogian Out As Her Counsel**

On March 24, 2011, Grace filed a substitution of attorney, substituting Manoogian out as her counsel and herself in in propria persona. Upon receipt of the signed substitution, Judge Burch requested that Manoogian appear on March 29 to discuss it.

At what proved to be an extremely contentious hearing, Judge Burch advised at the outset that he was "not inclined" to allow Manoogian to withdraw. He presented Manoogian with four questions to answer, questions the judge had apparently recently posed of counsel in another case.

When it became evident the only reason Grace was substituting Manoogian out was her inability to pay his fees, Judge Burch lectured Manoogian, who was represented by counsel at the hearing, as follows: "You knew from day one you were getting into this trial with a substantial chance that Ms. Aitchison could not pay your fees and that you were going to try, if you could—it is so clear to me that your whole strategy here was to have Mr. Aitchison pay your fees, if you could. And I don't know if you have any other arrangement with Ms. Aitchison to eat the excess fees, if you could [not] get them out of Mr. Aitchison. [¶] But the fact of the matter is it was clear from day one that Ms. Aitchison was not in a position to pay your full fee and that what you sought to do was have Mr. Aitchison pay your fees. You knew that from day one in the trial. [¶] And so to say now that it's any kind of a surprise that she has not come up with the money to pay fees is—is absolutely absurd. I can't even imagine anybody could make an argument to

17

the Court straight faced that you thought Ms. Aitchison at this point in the trial was going to be able by herself to afford your fee."

After significant back and forth with counsel for Manoogian about Manoogian's duties to Grace and the interests of justice under the circumstances, Manoogian's counsel asserted that there was not a level playing field in terms of Grace's access to fees in light of what David what paying his attorneys. Judge Burch responded that he was unpersuaded by counsel's argument, since Grace had been awarded over $150,000 in fees, which was "not a drop in the bucket." He acknowledged that David had spent "a substantial amount of money," but he explained: "I don't understand that there is a requirement that the playing field necessarily has to be level at all times and the Court has to open up the sieve from one side to the other and require equal amounts of attorney fees on both sides. [¶] As I said to Mr. Manoogian earlier in the case, in my view, at least part of the reason for the uneven expenditures of the expert fees and attorneys fees had to do with the relative burden of proof that the parties have here and what they are required to show in order to make their case. [¶] And—the Court's view is that $150,000 should have been enough and could have been enough to get Mr. Manoogian through to the end of the trial and then see where the chips fell in terms of additional attorney fees that might be awarded. But just to say the other side has spent more money than we have, I don't think is a reason to substitute out as counsel."

Judge Burch also provided examples of how Manoogian was responsible for drawing out the length of the trial: "Ms. Bank offered to take the bull by the horns and present her case first and then allow Mr. Manoogian to cross-examine to rebut and try to put holes in her case, and instead of taking her up on her offer, he decided to be a contrarian, [']If Ms. Bank wants it, there must be something wrong with that. So I'm going to go first.['] [¶] And my view is that Mr. Manoogian put on five days or so of evidence, which could have been taken in about two or two and a half days. There were many—at least several significant hiatuses during the course of each day where Mr. Manoogian would be going through his papers, trying to find what questions he wanted to ask. It was a very slow, dilatory process that could have been a lot shorter if

18

Mr. Manoogian had simply taken Ms. Bank up on her offer to let her try her case first and to prove the tracing which she wanted to prove, which apparently is the big issue in the case. [¶] Why Mr. Manoogian wanted to do that, I don't know. And in reality though, it—it may have extended the trial substantially longer than it needed to be and Ms. Bank is not to blame for it. Mr. Aitchison is not to blame for that. Mr. Manoogian is to blame for that."

After further exchange, Judge Burch declined to let Manoogian substitute out of the case, ordering him to continue representing Grace through the end of trial. He cited three facts for his order: (1) they were in the middle of trial; (2) it was a very complicated trial, and Grace was in no way equipped to represent herself; and (3) the cost of hiring a new attorney would be "staggering" because the new attorney would have no familiarity with the case.

Manoogian responded with an exposition of the claimed inequities of the case, including that Grace's accountant quit because she was not paying his bills. Judge Burch countered that Grace was not technically left without an accountant because she could subpoena him to testify at trial. He also added that if there was "an additional increment of work that Mr. Stegner could provide and you could explain why it's necessary," he might consider awarding additional funds.

Manoogian requested that Judge Burch stay the case so he could seek a writ, expressing his belief that the judge's order violated the Thirteenth Amendment of the United States Constitution. He opined that he had "somehow peeved" Judge Burch, and that the judge never liked the way he was conducting this case. Judge Burch responded as follows: "My view, at least part of this case is that so far the trial—has increased your costs and, therefore, increased Ms. Aitchison's costs, to some extent, because the trial was unnecessarily prolonged. Your case could have been presented in a materially shorter period of time than it was. [¶] I could remember distinctly during the course of the proceedings, actually on a couple of occasions, taking a break because you were not able and not ready to formulate questions in a particular subject area for any particular witness. [¶] And my personal observation was there were substantial periods of time

19

between questions where you would ask one question and literally have to fumble through the documents and, in my view, that was something that happened repeatedly and unnecessarily prolonged the presentation of your side of the case."

Judge Burch also disputed Manoogian's characterization that he was being ordered to work for free:  "I'm not saying you are not going to be able to bill her.  I'm not saying that you eventually won't be able to collect your billings, in some way or other, including, if I award attorney fees that the other side has to pay, but leaving Ms. Aitchison alone here to represent herself in this case would be, in my view, a travesty and I will not allow it."

Judge Burch then agreed to stay the proceedings at the close of business the next day, following two more days of trial that were already scheduled.

**Grace Petitions for a Writ of Mandate**

On May 5, 2011, Grace petitioned this court for a writ of mandate. (No. A131891).  The petition presented the following five arguments:  (1) "the failure to make adequate support and attorneys fee orders have [*sic*] prejudiced Grace from and have made it impossible for her to have a fair trial"; (2) "David could of [*sic*], and should have, been ordered to access assets under his control to pay Grace's fees and costs, just as he did for his; the character of the assets was not material";  (3) "the trial courts' [*sic*] handling of temporary support has been improper"; (4) "the court was without authority to order attorney Manoogian to continue to represent Grace after she had voluntarily signed a substitution of attorneys form"; and (5) "the trial judge has prejudged the case." Grace requested that we declare a mistrial, recuse Judge Burch, and start the matter "fresh" before a new judicial officer.

Five days later, we requested opposition to the petition.  After David filed his opposition, we denied the petition.  Grace then petitioned the Supreme Court for review, which petition was also denied.

**Trial Finally Concludes, and Both Parties Request Attorney's Fees**

In June 2011, trial resumed, with evidence taken for 12 additional days. Following the conclusion of trial on June 27, both parties submitted requests for

20

attorney's fees. According to David, he had incurred over $1.2 million in fees and costs, which included $668,879 in fees and $40,751 in costs to Bank's office, $207,948 for Boone's accounting services, $61,000 to oppose Grace's writ petition and petition for review, and additional miscellaneous expenses of approximately $27,800. David represented that the parties participated in three settlement conferences and that the matter should have settled and not proceeded to trial. According to David, Grace's conduct directly frustrated settlement and exorbitantly increased the cost of the litigation. As such, he argued that pursuant to section 271, he should be awarded all fees and costs he had incurred since the third settlement conference—a total of $652,357.

In her own section 271 request, Grace contended that David's litigation tactics were in fact responsible for dragging out the litigation. She agreed that the case should have settled early in the proceeding, but she blamed David for the lack of settlement, in large part due to his insistence that there was no transmutation, a position, she claimed, "unsupported by the law."[6] Grace also disputed that Manoogian exacerbated the length of litigation by arguing too much or taking unreasonable amounts of time, instead blaming the delay on Judge Burch "asking [his] own questions in a rather disruptive fashion . . . .," an allegation purportedly supported by a calculation of how many lines in the trial transcript were consumed by the court versus the parties' respective counsel. All told, Grace requested an award of $469,004, the amount still owed to her attorneys and accountants.

**Judge Burch's Statement of Decision**

On September 29, 2011, Judge Burch issued a proposed/tentative statement of decision after trial. David responded with a request that the court explain "the factual and legal basis for its decision as to each of the following controverted issues . . .," thereafter listing 60 questions, 22 of which concerned the validity of the premarital agreement.

---

[6] Curiously, Grace also asserted that "Sadly, no actual Settlement Conferences ever took place."

21

On December 2, 2011, Judge Burch entered a judgment of dissolution, appended to which was a 58-page statement of decision. Much of it is not pertinent to the issues before us, and we set forth only the findings that relate to the issues on appeal.

As a preliminary matter, Judge Burch reiterated his prior finding that the trust documents did not effectuate a transmutation of David's separate property. While losing on the transmutation issue, Grace prevailed on her claim that the premarital agreement was unenforceable. As to that, Judge Burch held that Grace met her burden of proving that her signing of the premarital agreement was involuntary because she had been misled as to the importance of specific terms in the agreement, and was unaware the agreement might alter her community property rights. According to Judge Burch, David and Grace had a confidential relationship where a constructive fraud was possible. As a result of the premarital agreement being unenforceable, the "gross up" funds David received from Tharco to repay his relatives for the Tharco stock were not governed by the provision of the premarital agreement, and instead constituted community property.

Judge Burch also found that, with few exceptions, accountant Boone's schedules were sufficiently trustworthy to support David's claims regarding the extent of his separate property interests in various assets, including the Schedule A account.

Concerning the pendente lite payments made by David to Grace during the litigation, Judge Burch allocated those amounts to David for either Grace's attorney fees or her support. He explained:

"Both before and during the trial, the court ordered four separate payments to be made to Grace. The first payment in the amount of $100,000 was ordered by Department 15 on February 19, 2010 and was part of an order that directed that both parties could draw $100,000 from the account subject to a later allocation order. There was no direct purpose specified for the use of the funds by either party. It is not possible to discern from the declaration of Grace's counsel filed post-trial in support of his request for attorney fees how much, if any, of these funds were paid to him by Grace on account of attorney fees. However, the court can infer from counsel's declaration, and the fact that $4006 constituted the combined spousal and child support being paid to Grace, that a

substantial percentage of the payments totaling $208,660 made to counsel for Grace as of the date of counsel's declaration came from the four payments ordered by the court before or during the trial.

"Furthermore, there were three other payments ordered to be paid to Grace to defray her attorney fees. The first amount of $75,000 was ordered by Department 15 on May 28, 2010. A second amount of $75,000 was ordered by this court on November 8, 2010 after trial had started. On January 10, 2011, this court ordered yet another amount of $15,000 to be paid by David to Grace exclusively for her attorney fees. In open court, counsel for Grace indicated that after receipt of the funds he had permitted a certain amount of these funds to be retained by Grace for her expenses notwithstanding the court's direction that the amount was to be paid solely for attorney fees and the costs of litigation.

"With regard to the allocation of these four payments, the court now orders that that [*sic*] amounts in their entirety be allocated to David for either the payment for Grace's attorney fees and her support. In other words, even though David has established that the balance of funds in the Schedule A account are his separate funds, the court is not ordering reimbursement from Grace for any of these amounts. In doing so, the court also acknowledges that this allocation of these amounts is being taken into account with respect to the court's awards of additional attorney fees and costs. In making this allocation, the court notes that it is unlikely that all of the unallocated $100,000 was in fact used to pay-attorney fees. However, the Declaration by Mr. Manoogian post-trial regarding his fees does not reflect what portion of fees paid to him derived from this $100,000 amount.

"In allocating these court-ordered amounts, the court is also taking into account that David began this case and continued throughout this case with two distinct financial advantages. First, he had control of the Schedule A account which early in the case had a [*sic*] initial value of approximately $1.4 to $1.5 million. Second, he had access to the substantial loan funds provided to him by relatives who were in a position to help him

23

fund this litigation. There was no evidence that Grace had any similar resources from which to draw in order to fund her litigation expenses."

As to spousal support, Judge Burch ordered David to continue paying Grace $4,006 per month until December 1, 2011, at which time the amount was to decrease to $2,700 per month. Also effective December 1, 2011, he was to pay Grace 20 percent of any gross income he received in excess of $110,000 per year. The court also ordered that "[e]ffective April 1, 2011" the monthly spousal support was to drop to $2,250 per month.[7]

Turning to the issue of attorney's fees, Judge Burch awarded Grace $35,000, which amount, in addition to the fees awarded pendente lite, was his "best effort to determine an allocation of attorney fees . . . that was 'reasonably necessary' for Grace to effectively present her case through the trial." He explained:

"To sum up the court's thinking, the court finds that David is in the relatively superior financial position with respect to Grace. Even though he may have a plausible argument that Grace and her counsel should be held accountable for increasing the costs of this litigation, including the trial, the court can and has taken those facts into account in deciding whether to award Grace's counsel any additional fees from David.

"Grace's counsel has asked this court to award the entirety of the remaining balance owed to him by Grace. Notwithstanding his attempt to end his representation in the middle of trial, and Grace's causing additional expenditures of funds in the appellate court to challenge this court's refusal to let him substitute out of the case mid-trial, counsel advocates for an amount attributable to his 'zealous representation' of his client. In effect, counsel for Grace claims that she is entitled to an amount that equalizes Grace with the amount expended by David. The amount requested, $379,312, would shift the entire cost of all of Grace's unpaid attorney fees to David.

"The court will grant an additional amount of attorney fees but pares the amount down considerably. The court orders that David shall pay to Grace an additional amount

---

[7] This date was clearly erroneous since it had already passed.

24

of $35,000 as additional attorney fees.  The court finds that a much lower amount than requested is awarded for the following reasons:

"As noted above, the court allotted considerable funds to Grace before and during the trial.  Some of these funds were allocated to Grace generally and some of the funds were specifically allocated to help her cover her legal expenses.  These amounts included $100,000 in unallocated funds ordered to be paid to Grace pendente lite in February 2010.  Three additional orders allocated $165,000 in attorney fees pendente lite.  Two of these orders totaling $90,000 were entered by this court.  Because neither Grace nor her counsel have provided a clear indication of the total amount of payments made to counsel from these unallocated funds, the court is going to consider them as having been used entirely for attorney fees.

"If there remains some disparity between David's attorney fees and Grace's total attorney fees, it must be observed that David's fees of necessity were much higher than Grace's.  He bore the responsibility of affirmatively proving in detail that certain assets and claims were traceable to his separate property.  This burden resulted in many hours of detailed accounting work which had to be reviewed by David's counsel.  The burden on Grace was to have sufficient funds to review the work of David's counsel and accountant. In the court's view, such a review by Grace's attorney and accountant would have involved much less time and expense than that to be invested by David and his expert and attorney in order to create the tracing.

"The trial was prolonged by counsel's dilatory conduct which included:

"a.  Repetitive offering into evidence of documents that the court had excluded on the basis of prior legal rulings relating to the transmutation issue . . . .

"b.  Repetitive questions attempting to elicit parol evidence relating to the transmutation issue despite repeated rulings by the court that parol evidence was not admissible to prove a transmutation under the clear rulings of the California Supreme Court.

"c.  One example of the unnecessary use of trial time to elicit parol evidence was Grace's calling of Sharon Rubens, a CPA who charged expert fees for her testimony.  A

25

significant part of Grace's examination of Rubens constituted an attempt to elicit parol evidence to prove that a transmutation had occurred.

"d. Another example of the waste of trial time was Grace's calling of Mary Mehwa, a bank official. It appeared that she was called to testify largely as part of another effort to have her give parol evidence to challenge this court's ruling on the transmutation issue.

"e. Repeated, long pauses between questions by counsel which the court noted on the record at trial.

"The court notes also that Grace's counsel stated a billing rate of $550 per hour. Among Family Law practitioners who have appeared in this court, this is an extraordinarily high hourly fee. While the court does not intend to suggest that this fee would be inappropriate where accepted by a willing client, the court does not believe that it is appropriate to charge such an extraordinary fee rate to an opposing party under [Family Code] §2030.

"Counsel for Grace appears to blame this court entirely for the excessive length of the trial based upon allegations that this court prolonged the trial by disruptive, tangential questions and by engaging in excessive 'dialogue' during the trial. See Declaration of Judith M. Manoogian filed on July 29, 2011 regarding 'Comparative Dialogue.' This declaration attempts to compare 'lines of dialogue' attributable to the court and counsel for both parties. The term 'lines of dialogue' is not otherwise defined.

"The court's simple response to counsel's 'comparative dialogue' allegation is that it is nonsense. . . . [Fn. omitted.]"

Judge Burch declined to award any fees for accountant Stegner, explaining: "Mr. Stegner, an accountant was retained by Grace to provide accounting services for various purposes during the trial. He was called to testify by Grace during the trial. According to representations made by counsel for Grace at some point after Mr. Stegner's testimony, he declined to provide further testimony or any other assistance to Grace unless his outstanding bill was paid. Based upon her claims of indigence Grace asked the court to order that David pay Mr. Stegner's outstanding bill. The court

26

indicated that, subject to consideration of further payments to be considered by the court after trial, it would order David to advance $10,000 to Mr. Stegner provided that he would agree to appear for additional testimony. According to Grace's counsel, Mr. Stegner refused to accept the $10,000 with a corresponding promise to appear for additional testimony. Under these circumstances, the court does not find that it is appropriate to award any additional amounts for Grace for payment to Mr. Stegner."

Turning to David's fee request, Judge Burch denied it in as far as David requested all fees he had incurred since the third settlement conference. He did, however, award David $25,000 pursuant to section 271 for fees incurred in responding to Grace's writ petition.

Lastly, Judge Burch noted David's request that he respond to numerous questions relating to the validity of the premarital agreement and other issues. He denied this request, as follows: "Because this court has decided the dispositive issues in this case by applying the pertinent legal principles to the facts of this case, it is unnecessary for the court to make the various specific findings or clarifications sought by David's counsel. See *Vukovich v. Radulovich* (1991) 235 Cal. App. 3d 281, 295 (court only required to resolve issue or issues that are necessary to a proper decision). To put it another way, the court must identify and resolve the ultimate issues but is not required to make a determination as to each factual dispute as to which counsel would like an answer. See e.g. *Muzquiz v. City of Emeryville* (2000) 79 Cal. App. 4th 1106, 1125–26. Counsel for David seems to contend that the court must make numerous findings on every disputed evidentiary point in the case or must clear up every perceived semantic ambiguity in the court's proposed decision even if the findings or 'clarifications' are unnecessary to a resolution of the case. The court has reviewed each of David's proposed questions to be answered both as to the validity of the PMA and as to the 'gross up' of David's salary and has modified certain language to make the court's finding's [sic] clearer. However, the court declines David's suggestion that the court respond to each and every specific question he has propounded as such responses are unnecessary to the resolution of the case."

27

Grace filed a timely appeal, and David a timely cross-appeal.

## DISCUSSION

### A. The Trust Documents Did Not Transmute David's Separate Property Into Community Property

In her first argument, Grace contends that The Aitchison 2000 Family Trust agreement transmuted much of David's separate property—specifically, those assets identified in Schedule A to the trust—to community property. This issue was critical to Grace's case below: if correct, the community estate was worth millions, with Grace likely to receive a substantial award of property; if incorrect, the community estate had minimal assets, and Grace would be entitled to a very modest allocation of assets. Judge Burch rejected Grace's claim both at the outset of trial and in his statement of decision, finding that neither the trust agreement in general nor Schedule A in particular satisfied the statutory requirements for a transmutation. We review his determination de novo (*In re Marriage of Barneson* (1999) 69 Cal.App.4th 583, 588; *In re Marriage of Starkman* (2005) 129 Cal.App.4th 659, 664 (*Marriage of Starkman*)), and we conclude that the trust documents were insufficient to create a transmutation.

Section 850, subdivision (b) generally provides that married persons may transmute the separate property of either spouse into community property "by agreement or transfer." (See also *In re Marriage of Haines* (1995) 33 Cal.App.4th 277, 293 [transmutation is "an interspousal transaction or agreement which works a change in the character of the property"].) Per section 852, subdivision (a), "A transmutation of real or personal property is not valid unless made in writing by an express declaration that is made, joined in, consented to, or accepted by the spouse whose interest in the property is adversely affected."

In the seminal case of *Estate of MacDonald* (1990) 51 Cal.3d 262, the California Supreme Court interpreted the term "express declaration" as used in section 852,

28

subdivision (a).[8]  There, a husband and wife sought to divide their community estate into separate property so they could leave their separate estates to their respective children from prior marriages.  The husband's portion of his community pension plans was placed into retirement accounts bearing his name and naming his separate trust as the account beneficiary.  Because the accounts named someone other than his wife as the beneficiary, her consent was required.  She signed the beneficiary designations contained in the account agreements, attesting that "I hereby consent to the above designation."  (*Id.* at pp. 265–266.)

On a challenge by the wife's heirs, the Supreme Court held that there had not been a transmutation.  As required, the consent paragraphs were "in writing" and "accepted" by the adversely affected spouse.  Significantly, however, they lacked language "expressly stating that [the wife] was effecting a change in the character or ownership" of the community property:  "[T]he consent paragraphs contain no language which characterizes the property assertedly being transmuted, viz., the pension funds which had been deposited in the account.  It is not possible to tell from the face of the consent paragraphs, or even from the face of the adoption agreements as a whole, whether decedent was aware that the legal effect of her signature might be to alter the character or ownership of her interest in the pension funds.  There is certainly no language in the consent paragraphs, or the adoption agreements as a whole, expressly stating that decedent was effecting a change in the character or ownership of her interest."  This did not mean, the court clarified, that a writing must use a particular term, such as "transmutation," "community property," or "separate property."  Instead, the language must simply express that the spouse "was effecting a change in the character or ownership of [his or] her interest."  The court suggested it would have been sufficient if the document had stated, " 'I give to the account holder any interest in the funds deposited in this account.' "  (*Estate of MacDonald, supra,* 51 Cal.3d at pp. 272–273; see

---

[8] The Court was construing then Civil Code section 5110.730, subdivision (a), the identically worded predecessor to section 852.

also *In re Marriage of Benson* (2005) 36 Cal.4th 1096, 1111 [confirming that a transmutation must be in writing].)

The trust documents here likewise fell short of section 852's "express declaration" requirement. In paragraph 1.1, David and Grace expressed their intention that any community property transferred to the trust—previously or in the future—would remain community property, and any separate property transferred—again, previously or in the future—would remain separate property. Paragraph 1.2.1 stated that all assets identified in schedule A were "before the transfer to this Trust, and shall remain after said transfer" community property. Schedule A as amended provided, "The undersigned, have either previously assigned, and or do hereby assign, transfer, bargain, sell and or convey to David T. Aitchison and Grace F. Aitchison, Trustees of The Aitchison 2000 Family Trust, dated February 28, 2000 ('said Trust Agreement'), all of their right, title and interest in and to the following assets, said assets consisting of the undersigned community property, and which shall comprise the Settlors' 'Settlors Community Estate,' " thereafter listing a number of assets. The only reasonable construction of these provisions—alone and collectively—is that they transferred certain assets to the trust. While the Schedule A assets were identified as community property, nowhere is there an expression by David changing the character of those assets from separate to community property. The trust language suggests the contemplation of another document that would transmute separate property to community property, but there was no evidence David ever executed such a document.[9]

*Marriage of Starkman, supra,* 129 Cal.App.4th 659 is particularly instructive. At issue there was a trust providing that the "Settlors agree that any property transferred by either of them to the Trust . . . is the community property of both of them unless such property is identified as the separate property of either Settlor." A contemporaneously executed general assignment conveyed " 'any asset, whether real, personal, or mixed . . .

_____

[9] Judge Burch posited an alternative possibility: the parties mistakenly believed that one or more of the Schedule A assets was already community property. This seems less plausible.

30

[the spouses] own now or which we may own in the future' " to the trust. The husband subsequently executed various stock brokerage forms to convey specific assets to the trust. (*Id*. at p. 662.)

The couple subsequently separated, and the husband revoked the trust. (*Marriage of Starkman, supra,* 129 Cal.App.4th at p. 662.) In the ensuing dissolution proceeding, the wife claimed that the assets the husband had conveyed to the trust by the stock brokerage forms had been transmuted into community property. (*Ibid.*) The trial court disagreed, and the wife appealed. (*Id.* at p. 663.)

The Court of Appeal affirmed. It observed that the trust's stated purposes were to avoid probate, allow for the orderly administration of the settlors' estates in the event of their death or incapacity, and possibly minimize the tax burden—not to transfer half of the husband's sizable estate to the wife. More importantly, because the trust document stated that the assets that would be conveyed to the trust *were* community property—as opposed to stating that they would thereby *become* community property—the trust agreement did not "unambiguously establish" that the husband was "effecting a change of ownership of the entirety of his significant separate estate." Similarly, neither the assignment nor the brokerage forms contained an express statement that the characterization or ownership of the property was being changed. (*Marriage of Starkman, supra,* 129 Cal.App.4th at pp. 664–665.) The court thus made a distinction that is critical here: language that merely characterizes an asset as separate or community property versus language that expresses an intent to change the character of an asset from one type of property to the other.

The factual situation in this case is strikingly analogous to that in *Marriage of Starkman*. Here, as in *Marriage of Starkman*, the trust documents conveyed certain separate property assets to the trust and characterized them as community property. However, and again like *Marriage of Starkman*, there was no language—in the trust agreement or elsewhere—expressly changing the character of the assets. In fact, paragraph 1.1 was to the contrary, specifically stating that the assets were to retain the character they had before the conveyance: "It is the Settlors' intention that any

31

community property which has been transferred to this Trust and the proceeds and increase thereof shall retain the character of and continue to be their community property, and that any separate property that has been or will be transferred to this Trust by a Settlor shall retain the character of and shall continue to be the separate property of the contributing Settlor."

The facts in the cases in which courts have found language satisfying section 852's express statement requirement are in stark contrast to the facts here. In *In re Marriage of Holtemann* (2008) 166 Cal.App.4th 1166, the spouses executed a "Spousal Property Transmutation Agreement," the introduction of which stated that " '[t]he parties are entering into this agreement in order to specify the character of their property interests pursuant to the applicable provisions of the California Family Code' " and that the agreement was " 'not made in contemplation of a separation or marital dissolution and is made solely for the purpose of interpreting how property shall be disposed of on the deaths of the parties.' " A subsequent article of the agreement stated: " 'Transmutation of Husband's Separate Property to Community Property. Husband agrees that the character of the property described in Exhibit A . . . is hereby transmuted from his separate property to the community property of both parties.' " Exhibit A was entitled both "Husband's Separate Property Being Transmuted to Community Property" and a "List of Community Property." (*Id.* at pp. 1169–1170.) And the couple's trust agreement stated that it was " 'a joint trust established by the settlors in order to hold community property of the settlors, which community property was created by the transmutation of separate property of settlor Frank G. Holtemann concurrently with the execution of this trust instrument." (*Id.* at pp. 1170–1171.)

Rejecting the husband's claim that the documents were ambiguous because they indicated they were executed solely for estate planning purposes, the Court of Appeal held that the husband effectively transmuted his separate property. (*In re Marriage of Holteman, supra,* 166 Cal.App.4th at p. 1172.) The agreement unambiguously stated that the character of the property described in Exhibit A was " 'transmuted from his separate property to the community property of both parties.' " Elsewhere in the agreement, as

32

well as the trust documents, the word "transmutation" was used repeatedly. While noting that "[a]n express declaration of transmutation does not necessarily require use of the terms 'transmutation,' 'community property,' or 'separate property,' " the court agreed with the trial court that " '[a] clearer statement of a transmutation is difficult to imagine.' " (*Id.* at pp. 1172–1173.)

More recently, in *In re Marriage of Lund* (2009) 174 Cal.App.4th 40, a married couple executed an "Agreement to Establish Interest in Property." An introductory recital stated that "At the date of marriage, Husband owned property, real or otherwise of substantial value and wife had assets of de minim[i]s value" and that "The Husband, for estate planning purposes desires to convert said separate property into community property." (*Id* at p. 44.) A section titled "converted property" provided: " 'All of the property, real and personal, held in the name of Husband having its origin in his separate property no matter how received and/or earned, is hereby converted to community property of Husband and Wife, and shall thereafter be the community property of the parties for estate planning hereto, each having a present, existing, and equal interest therein.' " (*Id.* at p. 45.) The Court of Appeal concluded that the agreement "unambiguously" effected a transmutation of the husband's separate property into community property. (*Id.* at p. 51.)

Similarly, in *Estate of Bibb* (2001) 87 Cal.App.4th 461, the court held that a grant deed signed by a husband transferring his separate property interest in real property to himself and his wife as joint tenants satisfied the "express declaration" requirement of section 852, subdivision (a), because it contained a clear and unambiguous expression of intent to transfer the real property interest. (*Id.* at pp. 468–469.) The court reasoned that the husband's use of the term "grant" was equivalent to giving an interest, which the *Estate of MacDonald* court held would have been adequate for a transmutation. (*Id.* at p. 468.) At the same time, the court held that a "DMV Vehicle Registration Information" printout reflecting that a car originally registered in the husband's name alone was reregistered in the names of both the husband and wife did not satisfy the requirements of section 852, subdivision (a). (*Id.* at pp. 469–470.)

The *Holteman/Lund/Bibb* line of authorities exemplify the express statement the Legislature contemplated when enacting Civil Code 5110.730, and later section 852. Such statement was simply absent from The Aitchison 2000 Family Trust agreement.

The essence of Grace's argument to the contrary is that the trust agreement evidenced David's intent that all property listed on Schedule A be community property. Indeed, in the three and one-third pages of her reply brief dedicated to the transmutation issue, Grace uses the words "intention," "intended," "intent," and "intentional" ten different times. But the authorities make clear that David's intention with respect to transmutation was irrelevant; whether or not there was an effective transmutation is solely governed by the language of the trust documents. And Grace simply cannot identify any language purporting to *change* the character of David's property, rather than merely *identifying* it.

Grace alternatively argues that if the trust agreement was ambiguous, Judge Burch erred in denying her the right to introduce extrinsic evidence—namely, the November 7, 2000 Scampini letter—to establish David's intention to transmute his separate property into community property. On this topic, she queries, "While the Court is correct that transmutations are to determined [*sic*] by the four corners of the document, does that mean that absolutely no evidence as to the parties' intent or the drafter's intent is relevant?" The unequivocal answer to that question is a resounding yes, as case law universally makes clear: extrinsic evidence is inadmissible on the question of transmutation. (See, e.g., *Estate of MacDonald, supra,* 51 Cal.3d at pp. 271–272; *In re Marriage of Benson, supra,* 36 Cal.4th at p. 1106 ["the writing must reflect a transmutation on its face, and must eliminate the need to consider other evidence in divining this intent"]; *Marriage of Starkman, supra,* 129 Cal.App.4th at p. 665 [letter sent by attorney warning "that separate property be clearly identified as such" was inadmissible extrinsic evidence]; *In re Marriage of Barneson, supra,* 69 Cal.App.4th at p. 592 ["[T]he transmutation determination must be made without resort to extrinsic evidence."]; Hogoboom & King, Cal. Practice Guide: Family Law (The Rutter Group 2013) ¶ 8:478 ["by requiring an express written declaration that characterization or

ownership is being changed, Fam.C. § 852(a) effectively makes *irrelevant and inadmissible* extrinsic evidence of an intent to transmute (or not to transmute)"].)

The history of the transmutation statute further confirms this is so. Traditionally, there were no formal requirements for establishing a transmutation, with courts finding transmutations based on oral statements or even implications from the parties' conduct. (*Recommendation Relating to Marital Property Presumptions and Transmutations*, 17 Cal. Law Revision Com. Rep. (1984) 209, 213.) Believing that the lack of formal requirements generated excessive litigation (*id.* at p. 214), the Law Revision Commission proposed a new statute that would "increas[e] certainty in the determination whether a transmutation has in fact occurred." (*Id.* at pp. 224–225.) The proposed statute provided that "[a] transmutation of real or personal property is not valid unless made in writing by an express declaration that is made, joined in, consented to, or accepted by the spouse whose interest in the property is adversely affected." The Legislature enacted Civil Code section 5110.730, subdivision (a) the following year. (Stats. 1984, ch. 1733, § 3, p. 6302.) And, as discussed above, the court in *Estate of MacDonald* subsequently held that the "express declaration" provision required language specifically stating that the characterization of the property was being changed, without resort to extrinsic evidence. In reaching this holding, the court made the following observation: "Manifestly, there are policy considerations weighing both in favor of and against any type of transmutation proof requirement. On the one hand, honoring the intentions of the parties involved in a purported transmutation may suggest that weight should be given to any indication of these intentions. On the other hand, the desirability of assuring that a spouse's community property entitlements are not improperly undermined, as well as concern for judicial economy and efficiency, support somewhat more restrictive proof requirements. The Legislature, in enacting section 5110.730 (a), apparently thought it unwise to rely on some kinds of evidence to effect transmutations. It is not for us to question that legislative conclusion." (*Estate of MacDonald, supra,* 51 Cal.3d at p. 273.) In light of this, Judge Burch was undoubtedly within his discretion to exclude the Scampini letter.

35

In a related argument, Grace submits that she was wrongfully prevented from obtaining certain discovery from Scampini due to Judge Burch's erroneous finding that she and Scampini did not have an attorney-client relationship. She contends that he was, in fact, her attorney as well as David's by virtue of him having drafted the trust, its amendments, and her will. As such, she continues, she had a right to obtain from him information concerning community affairs and estate planning, information that was denied to her because it was ostensibly protected by the attorney client privilege. We need not reach this issue, since even assuming for argument's sake that Grace was indeed Scampini's client, any extrinsic evidence she might theoretically have obtained would nevertheless have been inadmissible on the transmutation issue.[10] We thus find no abuse in the trial court's discretion in denying Grace certain discovery from Scampini and prohibiting her from soliciting certain evidence from him at trial, whether or not he was her attorney.

## B.   Judge Burch's Attorney's Fee Award Did Not Constitute an Abuse of Discretion

Grace next challenges the amount of attorney's fees David was ordered to pay her, contending the fees were so inadequate it was "impossible" for her to have a fair trial, resulting in "a miscarriage of justice." David disputes Grace's entitlement to additional fees on multiple grounds, the first of which is that any challenge to the pendente lite fee awards is "Far, Far Too Late." While Grace's briefs discuss the pendente lite fee awards at length, she appeals from Judge Burch's final fee award of an additional $35,000. This appeal is clearly timely. We thus turn to the merits of Grace's claim.

---

[10] At trial, Manoogian speculated that the "express declaration" required by section 852, subdivision (a) and seemingly contemplated by the trust documents was contained in Scampini's files. Bank confirmed that Grace had demanded production of such a document, but that both Scampini and David had testified there was no such document. Judge Burch ordered Scampini to produce the document if it existed. It goes without saying that no such document was forthcoming.

### 1. The Law and Standard of Review

The award of attorney's fees in a dissolution action is governed by section 2030, which provides that "the court shall ensure that each party has access to legal representation," which includes ordering one party to pay the other party "whatever amount is reasonably necessary for attorney's fees and for the cost of maintaining or defending the proceeding . . . ." Pursuant to section 2032, a fee award should be "just and reasonable under the relative circumstances of the respective parties," taking "into consideration the need for the award to enable each party, to the extent practical, to have sufficient financial resources to present the party's case adequately . . . ."

Courts have identified numerous factors that guide the decision whether to order fees and, if so, the amount. Such factors include: the nature of the litigation, its complexity, and the amount involved; the financial circumstances of the parties; the legal skills involved; whether counsel's skill and effort were wisely devoted to the expeditious disposition of the case; the success of counsel's efforts; the respective attorneys' professional standing and reputation; the intricacies and importance of the litigation; the labor and necessity for skilled legal training and ability in trying the case; the time consumed; the litigants' trial tactics; and the litigation costs already incurred and expected to be incurred through trial. (*In re Marriage of Keech* (1999) 75 Cal.App.4th 860, 870; *In re Marriage of O'Connor* (1997) 59 Cal.App.4th 877, 884; *In re Marriage of Jovel* (1996) 49 Cal.App.4th 575, 588; *In re Marriage of Braud* (1996) 45 Cal.App.4th 797, 827; *In re Marriage of Huntington* (1992) 10 Cal.App.4th 1513, 1523; *In re Marriage of Cueva* (1978) 86 Cal.App.3d 290, 296.)

It has been said that an "expeditious and final resolution of marital dissolution actions is best accomplished by providing . . . a parity between spouses in their ability to obtain effective legal representation." (*In re Marriage of Hatch* (1985) 169 Cal.App.3d 1213, 1215 (*Marriage of Hatch*).) Put another way, the purpose of sections 2030 and 2032 is " ' "leveling the playing field" and permitting the lower-earning spouse to pay counsel and experts to litigate the issues in the same manner as the spouse with higher

earning.' " (*In re Marriage of Tharp* (2010) 188 Cal.App.4th 1295, 1315 (*Marriage of Tharp*).)

Trial courts enjoy broad discretion in making fee awards in a dissolution action (*In re Marriage of Cheriton* (2001) 92 Cal.App.4th 269, 314–315), and we review such awards for abuse of that discretion. (*Marriage of Tharp, supra,* 188 Cal.App.4th at p. 1312; *In re Marriage of Braud, supra,* 45 Cal.App.4th at p. 827.) "[T]he trial court's order will be overturned only if, considering all the evidence viewed most favorably in support of its order, no judge could reasonably make the order made. [Citations.]" (*In re Marriage of Cueva, supra,* 86 Cal.App.3d at p. 296.)

### 2. The Fees Awarded Were Within the Court's Discretion

It is difficult to ascertain precisely how much was made available to Grace for attorney's fees and costs. David initially represents that she received a total of nearly $400,000, an amount he later revises down to $351,000. Grace's estimate, not surprisingly, is much more conservative. She claims a total fee award of $175,000, out of which Manoogian paid Stegner $27,983.50, leaving $147,016.50 for attorney's fees. As we understand it, the actual amount was somewhere in between.

The trial court awarded Grace the following amounts dedicated strictly for attorney's fees: $75,000 on May 28, 2010; another $75,000 on November 8, 2010; $15,000 on January 13, 2011; and $35,000 at the conclusion of the trial. Grace also received the $100,000 distribution at the outset of that case that likely went in part to her fees and in part to her living expenses. From one of the fee awards, Grace retained $11,000 for her living expenses, and she was ordered to pay sanctions to David of $25,000 for filing what Judge Burch deemed a frivolous writ petition. Thus, the net amount to Grace was $164,000, plus whatever she used from the $100,000 uncharacterized distribution.[11] We conclude there was no abuse of discretion in awarding her fees and costs in this amount.

---

[11] Because Grace never clarified how much of the $100,000 in unallocated funds were paid to Manoogian, Judge Burch "consider[ed] them as having been used entirely

38

Over the course of the long trial, as well as in his statement of decision, Judge Burch identified numerous factors that influenced the amount of fees he awarded Grace. Particularly significant was that fact that David's and Grace's cases were notably different. David was claiming that much of the couple's estate was his separate property and, as such, he bore the burden of tracing the assets back to his separate property. This required his accountants and attorneys to compile and review 22 years worth of financial records, including multiple stock sales and complicated business transactions of the Aitchison family. Grace, on the other hand, was only required to review the compilations produced by David's experts. This factor alone accounted for a sizable disparity in what each side would reasonably incur in putting on its case, both in terms of attorney's fees and accountant costs.

Judge Burch also considered it significant that Bank offered to present David's case first, a sensible suggestion given his burden. But Manoogian refused to proceed in such a fashion, a decision Judge Burch described as "contrarian"—rejecting the proposal simply because Bank made it. There can be no doubt that had David proceeded first, the trial would have been vastly shorter and Grace's fees (and David's fees, for that matter) significantly less. As Judge Burch noted during the trial, Manoogian spent multiple days "wandering around . . . in the evidence," which likely would not have happened had Bank been permitted to go first.

Moreover, Judge Burch identified numerous ways in which Manoogian's "dilatory conduct" greatly prolonged the trial, a trial that was initially expected to last five days but instead ended up taking 24 days. While the record is replete with examples, Judge Burch specifically identified in his statement of decision the following five examples of Manoogian's conduct: (1) repeatedly offering into evidence documents that the court had previously excluded based on prior legal rulings relating to the transmutation issue; (2) repetitive questions attempting to elicit parol evidence relating to the transmutation

---

for attorney fees." Grace received no temporary spousal support from December 2009 to June 2010, so one can only conclude that a significant portion of the $100,000 went to her living expenses.

39

issue despite prior rulings that parol evidence was not admissible to prove a transmutation; (3) calling accountant Sharon Rubens, who charged expert fees for her testimony, in an attempt to elicit parol evidence on the transmutation issue; (4) calling bank official Mary Mehwa to elicit parol evidence on the transmutation issue; and (5) "[r]epeated, long pauses between questions by counsel which the court noted on the record at trial."

Judge Burch's comments during the hearing on Manoogian's attempt to substitute out of the case summed it up well: "[M]y view is that Mr. Manoogian put on five days or so of evidence, which could have been taken in about two or two and a half days. There were many—at least several significant hiatuses during the course of each day where Mr. Manoogian would be going through his papers, trying to find what questions he wanted to ask. It was a very slow, dilatory process that could have been a lot shorter if Mr. Manoogian had simply taken Ms. Bank up on her offer to let her try her case first and to prove the tracing which she wanted to prove, which apparently is the big issue in the case. [¶] Why Mr. Manoogian wanted to do that, I don't know. And in reality though, it—it may have extended the trial substantially longer than it needed to be and Ms. Bank is not to blame for it. Mr. Aitchison is not to blame for that. Mr. Manoogian is to blame for that."

Judge Burch also considered the rate Manoogian charged "extraordinarily high . . . ." He billed Grace at a rate of $550 per hour, which was over 40 percent higher than Bank's hourly rate of $390. According to the judge, that rate might be acceptable where paid by a willing client, but he did not consider it appropriate to charge such an excessive rate to an opposing party.

While conceding that Manoogian was at least in part responsible for unreasonably prolonging the length of the trial, Grace nevertheless claims that the fee award was an abuse of discretion because there was a lack of parity between what she was given for her attorneys and experts and what David spent on his. And Grace has made clear—both below and on appeal—that, in her view, "parity" means equal funds. This is not so. Rather, it means equality " ' " 'between spouses in their ability to obtain effective legal

40

representation.' " ' " (*Alan S. v. Superior Court* (2009) 172 Cal.App.4th 238, 251–252 (*Alan S.*), quoting *Droeger v. Friedman, Sloan & Ross* (1991) 54 Cal.3d 26, 41, fn. 12.) And that equality is influenced by the numerous factors previously enumerated. In short, the fact that David outspent her by a sizeable margin does not mean there was not a level playing field.

In urging reversal, Grace relies primarily on three cases, none of which compels a different result. The first, *Marriage of Hatch, supra,* 169 Cal.App.3d 1213, involved a housewife who had not worked outside the home during the 10 years preceding the dissolution action and a husband who was a journeyman plumber who had been out of work and was receiving unemployment benefits supplemented with income from wood cutting work. The wife filed a request for child and spousal support, as well as attorney's fees and costs. (*Id.* at p. 1216.) At the hearing on her request, wife's counsel requested the court order temporary attorney's fees because the wife had no income and had no ability to pay her fees and costs. (*Id.* at p. 1217.) The court essentially dismissed the request, advising counsel that it "virtually never" granted pendente lite fees because the entitlement to attorney's fees depended on property division, which is not decided until the conclusion of the case. It explained to counsel: "[I]n the family-law area an attorney ordinarily carries the client until the time of trial, if the lawyer has reason to suppose that he will be ultimately paid . . . ." (*Ibid.*)

The Court of Appeal reversed, concluding that the trial court failed to exercise its discretion. (*Marriage of Hatch, supra,* 169 Cal.App.3d at pp. 1218-1219.) It noted that the court neglected to consider the factors required by law, including the respective incomes and needs of the parties, and it "evidenced a complete disregard for [the wife's] need to retain skilled counsel to represent her interests in the resolution of the issues of the case, and the difficulties she would face finding adequate counsel who could afford to defer all payment until a final resolution occurred." (*Id.* at pp. 1219–1220.) As to the trial court's claim that counsel in family law cases should be prepared to carry his or her client, the court stated: "Unfortunately it is often true that the financial circumstances of spouses at the breakup of marriages do not permit timely payment of counsel for services

41

as they are rendered and, in fact, counsel for financially disadvantaged spouses rarely receive final payment until long after the litigation is over. However, the courts should not make a bad situation worse. The suggestion of the trial court that attorneys handling marital dissolution cases must be prepared to 'carry the client until the time of trial' is not only demeaning to attorneys handling family law cases, it fails to consider the present day realities of the economics of the practice of law." (*Id.* at p. 1218, fn. 2.)

While we agree with the Court of Appeal's observations, that was not the situation here. There can be no doubt that Judge Burch exercised his discretion, hearing Grace's multiple pendente lite fee requests over the course of the case in often times lengthy hearings and awarding her a portion of the fees requested on multiple occasions. During the litigation, Grace had been awarded $165,000 dedicated to attorney's fees, with an additional $100,000 in discretionary funds also in her possession. Judge Burch viewed this as enough to get her through trial, and he did not expect Manoogian to "carry" her, as was the case in *Marriage of Hatch*.

Grace also relies on two recent cases she claims are analogous to her situation. The first, *Alan S., supra,* 172 Cal.App.4th 238, was a child custody case in which the trial court ordered pendente lite attorney's fees to the wife of $9,000. The husband filed a writ petition challenging the order, which petition the Court of Appeal granted. It held that the trial court was obligated to consider the relevant factors set forth in sections 2030 and 2032, which it failed to do. For example, it neglected to consider the husband's negative cash flow of $800 per month; the $25,000 in credit card debt he had incurred for his former counsel; the respective amounts of property owned by the parties; the $1,800 monthly child support the husband was paying the wife; new mate or partner contributions to the respective households, since the wife had remarried and the husband was living with the mother of his newborn child; and the incurrence of by the wife of fees that were "clearly not 'reasonably necessary' for the litigation . . . ." (*Id.* at pp. 242–243, 255.)

In reaching its conclusion, the court explained that the purpose of section 2030 "is *not* the redistribution of money from the greater income party to the lesser income party.

42

Its purpose is *parity*: a fair hearing with two sides equally represented. The idea is that both sides should have the opportunity to retain counsel, not just (as is usually the case) only the party with greater financial strength." (*Alan S., supra,* 172 Cal.App.4th at p. 251.)

While we disagree with Grace that *Alan S.* is "eerily similar" to this situation, we do find the case instructive in other regards not advocated by Grace. For one, the court emphasized that the object of section 2030 "is *not* the redistribution of money from the greater income party to the lesser income party" (*Alan S., supra,* 172 Cal.App.4th at p. 251), as Grace would have it. Indeed, during trial, Judge Burch admonished Manoogian for his sense of "entitlement" to the same funds David was spending on his attorneys and accountants, as if the wealthier spouse is obligated, no questions asked, to pay any amount of fees incurred by the supported spouse. For another, the Court of Appeal recognized that the trial court failed to explore one very significant factor, that being the wife's overlitigation of the case, suggesting that she had incurred fees that were not "reasonably necessary" as required by section 2032. (*Id.* at pp. 255–256.) The record before us indicates that Judge Burch was of the same opinion here: many of the fees Grace incurred were not reasonably necessary, due to her overlitigation and Manoogian's lack of preparation and "contrarian" insistence at putting on Grace's case first. And, as Judge Burch correctly noted, it was not his role "to open up the sieve from one side to the other and require equal amounts of attorney fees on both sides."

Lastly, Grace relies on *Marriage of Tharp, supra,* 188 Cal.App.4th 1295, in which the trial court denied the wife's initial motion for pendente lite attorney's fees, her request for reconsideration, and her third motion for previously incurred attorney's fees, awarding her only $20,000 for all future work in the case, to be paid at the conclusion of trial. (*Id.* at pp. 1304–1308.) The wife appealed, and the Court of Appeal reversed. (*Id.* at p. 1312.)

As in *Marriage of Hatch*, the Court of Appeal held that the trial court failed to exercise its discretion. (*Marriage of Tharp, supra,* 188 Cal.App.4th at p. 1312.) It observed that "While the family court has considerable latitude in fashioning or denying

an attorney fees award, its decision must reflect an exercise of discretion and a consideration of the appropriate factors as set forth in code sections 2030 and 2032. [Citation.] . . . Further, in determining whether to award attorney fees to one party, the family court may consider the other party's trial tactics." (*Id*. at pp. 1313–1314.) The court concluded with the following observation: "The public policy purpose behind sections 2030 and 2032 is ' "leveling the playing field" and permitting the lower-earning spouse to pay counsel and experts to litigate the issues in the same manner as the spouse with higher earnings.' [Citations.] Attorney fees, financial experts, other experts, witness fees, and other costs are all awardable. [Citation.] A spouse should not have to utilize support payments designed to pay living expenses to fund litigation in the dissolution proceeding." (*Id*. at pp. 1315–1316.)

Again, we do not disagree with the general propositions for which *Marriage of Tharp* stands. But it simply does not compel a different result here. Each time one of Grace's numerous fee requests came on for hearing, Judge Burch thoroughly and thoughtfully evaluated the request and explained the reasons for his ruling. And given the factors that bear upon a fee award—including, as the *Tharp* court noted, trial tactics—we cannot say that it was an abuse of discretion to award Grace a total of $164,000 in addition to a portion of the $100,000 distribution,

Grace makes two final arguments, both pertaining to Manoogian's conduct. First while conceding on the one hand that "the way certain portions of this lengthy trial was handled can be blamed on Manoogian, she disputes that the trial was greatly lengthened by his lack of preparedness or other conduct, contending that it was instead due to "the Court's permitting David to file an entirely new voluminous tracing in the middle of trial." She makes much of the fact that 11 days of trial had been completed based on David's original tracing, and only then did David request that accountant Boone be permitted to testify and present a new analysis. This, she contends, "Most Certainly Justified a Substantial Fee and Costs Order to Deal With It." But as Judge Burch explained in his statement of decision, David's "burden resulted in many hours of detailed accounting work which had to be reviewed by David's counsel. The burden on

44

Grace was to have sufficient funds to review the work of David's counsel and accountant. In the court's view, such a review by Grace's attorney and accountant would have involved much less time and expense than that to be invested by David and his expert and attorney in order to create the tracing." Additionally, even assuming for argument's sake that the trial was prolonged by David retaining a new accountant, that in no way negates Judge Burch's finding that the trial was prolonged by Manoogian's contrarian insistence on presenting Grace's case first, and being unprepared when he did so.

Lastly, Grace takes exception with the allegation that Manoogian took the case assuming that David would be required to pay whatever fees he generated. As she explains it, "There was $1.3+ million in a joint bank account and a transmutation agreement that Grace believes the reasonable interpretation of which would have found it to be valid. Most of her fee requests were not that David pay her fees—they were requests for access to jointly-titled monies." The flaw in this argument, however, is that the very character of the "jointly-titled monies" was in dispute. And as Judge Burch ultimately found, David established that those funds were his separate property. Grace never cited any authority authorizing the court to order disbursement of the funds, or even joint control over the account, simply because Grace claimed it was community property.

On a final note, Grace contends that Judge Burch should have ordered David to access his separate property assets to pay Grace adequate support and attorney's fees, and that he should have considered David's ability to borrow in making his fee awards. Because we conclude there was no abuse of discretion in the attorney's fees awarded to Grace, we need not consider Grace's arguments concerning the sources for additional fees.

### C. Judge Burch Did Not Abuse His Discretion In Sanctioning Grace for Filing a Writ Petition

In her third and final argument, one that consumes all of two pages in her opening brief, Grace challenges the $25,000 in sanctions she was ordered to pay David for attorney's fees he incurred in opposing her writ petition. According to Grace, there can

be "no doubt" that Judge Burch "was expressing personal outrage at the allegations made against him in the writ petition" and that the sanctions were his way of punishing her for making allegations he found "unflattering" and "overly critical." She submits that, in fact, the issues she presented in her petition were not frivolous, and the sanctions were thus improper. We review Judge Burch's sanctions award for abuse of discretion. (*In re Marriage of Davenport* (2011) 194 Cal.App.4th 1507, 1524.) " ' "[W]e will overturn such an order only if, considering all of the evidence viewed most favorably in its support and indulging all reasonable inferences in its favor, no judge could reasonably make the order." ' " (*Parker v. Harbert* (2012) 212 Cal.App.4th 1172, 1177.) We conclude there was no abuse of discretion.

Section 271 provides for an award of attorney's fees and costs in the form of sanctions when the conduct of a party or attorney "frustrates the policy of the law to promote settlement of litigation and, where possible, to reduce the cost of litigation by encouraging cooperation between the parties and attorneys." We recently had occasion to consider section 271 sanctions in *In re Marriage of Davenport, supra,* 194 Cal.App.4th 1507, 1524, where we observed: "It has been said that section 271 and its predecessor impose a 'minimum level of professionalism and cooperation,' to effect the policy favoring settlement of family law litigation—and a reduction of the attendant costs. (*In re Marriage of Daniels* (1993) 19 Cal.App.4th 1102, 1107; accord, *In re Marriage of Freeman, supra,* 132 Cal.App.4th at p. 6 ['The statute is aimed at conduct that furthers or frustrates settlement of family law litigation and at reduction of litigation cost.']; see also *In re Marriage of Quinlan* (1989) 209 Cal.App.3d 1417, 1422.) Section 271 ' "authorizes sanctions to advance the policy of promoting settlement of litigation and encouraging cooperation of the litigants" and "does not require any actual injury." [Citation.] Litigants who flout that policy by engaging in conduct that increases litigation costs are subject to imposition of attorney fees and costs as a section 271 sanction.' (*In re Marriage of Corona* (2009) 172 Cal.App.4th 1205, 1225.) Some courts have said the section authorizes attorney fees and costs as a penalty for obstreperous conduct. (See

*Robert J. v. Catherine D.* (2009) 171 Cal.App.4th 1500, 1520; *In re Marriage of Freeman, supra,* 132 Cal.App.4th at p. 6.)"

In reviewing Judge Burch's statement of decision on the sanctions issue, it is evident that he sanctioned Grace not for the disparaging allegations she directed at him, but for three other reasons. First, Grace made misrepresentations and false accusations regarding the transmutation issue, claiming that Judge Burch had prejudged the issue before hearing all of the evidence when, in fact, Manoogian, with Bank in agreement, requested he decide the issue at the outset of trial. Second, Grace raised challenges to previously issued orders concerning preliminary support, but these two orders were separately appealable, and the time for appeal had run. Third, in her petition to the Supreme Court, Grace improperly raised an issue that she had not presented in her petition to this court, namely her allegation that Judge Burch had a "policy" of mandating that attorneys not be permitted to substitute out of cases during trial, an allegation, according to Judge Burch, without any factual support. In light of these stated reasons, which find support in the record, we cannot conclude that the sanctions order constituted an abuse of discretion.

Grace also argues that section 271 bars the imposition of sanctions if they would impose "an unreasonable financial burden on the party against whom the sanction is imposed." She contends that was the case here, since the sanctions amounted to over nine months of her total income, and that after selling her house and paying her attorney fees, "she was essentially left with zero property." Judge Burch did, however, take Grace's financial situation into consideration when setting the sanctions amount at $25,000. He noted that without considering Grace's ability to pay, he would likely have awarded David all of his attorney's fees for opposing Grace's two petitions ($61,206). Instead, balancing Grace's ability to pay against what he considered "wholly unnecessary appellate expenses relating to all but one of the appellate issues,"[12] he reduced the

[12] Judge Burch acknowledged his refusal to let Manoogian out of the case was an arguably legitimate issue for writ review.

sanctions to $25,000, the amount David incurred for his Supreme Court briefing alone. Given Judge Burch's careful balancing, we cannot find an abuse of discretion.

### D. Substantial Evidence Supported Judge Burch's Finding That Grace Did Not Voluntarily Execute the Premarital Agreement

David's cross-appeal challenges only Judge Burch's finding that the premarital agreement was unenforceable. Before we reach the merits of David's appeal, we first address Grace's motion to strike all but sections II and III of his reply brief on cross-appeal.

In her motion, Grace contends that David's cross-appellant's opening brief argued only that she failed to establish she was "especially vulnerable or incapacitated" and, consequently, Judge Burch erred in finding the parties were in a confidential relationship. But, according to Grace, his reply brief contains entirely new arguments. Despite David's protestations that his reply brief did not raise new issues, we find Grace's motion largely well taken.

In David's 86-page combined respondent's brief and cross-appellant's opening brief, he dedicated a mere three pages of analysis to his cross-appeal. In that section, he noted Judge Burch refused to enforce the premarital agreement on the ground Grace had established she had not executed it voluntarily, a conclusion that rested on him finding "a form of constructive fraud occurred," which in turn rested on his finding that David and Grace were in a "confidential relationship" at the time they signed the premarital agreement. Arguing that vulnerability was a predicate of a confidential relationship, David contends that Judge Burch committed reversible error by declining to make a findings concerning "(1) whether Grace had possessed the mental capacity to enter into a premarital agreement; and (2) whether she had possessed the ability to understand such an agreement . . . ." David then submitted that the record contained no substantial evidence to support a finding of vulnerability. In claimed support, he cited (without analysis) six legal authorities, only one of which even involved the enforceability of a marital agreement, and none of which was *In re Marriage of Bonds* (2000) 24 Cal.4th 1,

48

which governed the enforceability of premarital agreements. That is the extent of David's opening brief.

Fast forward to David's 28-page reply brief on cross-appeal.[13] There, he briefly disputes Grace's assertion that he did not raise the issue of voluntariness in his opening brief. But then he goes on to add a series of new arguments, including the following:

(1) a four-page section claiming Judge Burch improperly shifted to him the burden to show voluntariness;

(2) a six-page argument that there was no substantial evidence he received an unfair advantage in the agreement;

(3) discussion of the purpose of the Uniform Premarital Agreement Act (§ 1610, et seq.), which was only cited in passing in his opening brief;

(4) recitals from the premarital agreement itself, the contents of which he never discussed in his opening brief on cross-appeal;

(5) reliance on the presumption in Evidence Code section 622 that "facts recited in a written instrument are conclusively presumed to be true";

(6) the effect of the fact that Grace was not represented by counsel;

(7) the effect of Grace's acknowledgment that she signed the agreement without reading it;

(8) extensive discussion of facts relating to the circumstances surrounding Grace's signing of the agreement, virtually none of which are mentioned in David's argument on his cross-appeal;

(9) facts concerning Grace's background, including her educational and work history, which are not cited anywhere in David's 86-page combined respondent's brief and opening brief on cross-appeal; and

(10) no fewer than 11 citations to *In re Marriage of Bonds, supra,* 24 Cal.4th 1.

---

[13] Notably, David's reply brief was filed by different counsel than his respondent's brief and opening brief on cross-appeal.

It is well established that the purpose of a reply brief is to address arguments made in the respondent's brief; it may not be used to raise new arguments or present new authorities. "Points raised for the first time in a reply brief ordinarily will not be considered because such consideration would either deprive respondent of an opportunity to counter the argument or require the effort and delay of additional brief by permission. [*Marriage of Khera & Sameer* (2012) 206 Cal.App.4th 1467, 1477—"Obvious reasons of fairness militate against consideration of an issue raised initially in the reply brief of an appellant"; *SCI Calif. Funeral Services, Inc. v. Five Bridges Found.* (2012) 203 Cal.App.4th 549, 573, fn. 18—" 'appellant cannot salvage a forfeited argument by belatedly addressing the argument in its reply brief' " . . .]." (Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2013) ¶ 9.78.2.) Nor does the retention of new appellate counsel justify raising new arguments in a reply brief. (*Id.*, ¶ 9:78.3 ["The fact appellant retained a new attorney after filing the opening brief is likely *not* to be deemed a sufficient 'good cause' justification for waiting until the reply brief to raise new issues . . . ."].)

There can be no doubt that David's reply brief on cross-appeal did more than simply respond to the issues Grace raised in her respondent's brief. And he never sought permission to file a supplemental opening brief. We therefore grant Grace's motion and strike the portions of David's reply brief that raise new issues.[14] With that, we turn to the issue before us—whether substantial evidence supported Judge Burch's finding that Grace had not executed the premarital agreement voluntarily. We conclude that it did.

---

[14] In her motion to strike, Grace asserts that David only argued she failed to show that she was especially vulnerable or incapacitated when she executed the agreement, such that the confidential relationship finding could not stand. In other words, he did not raise the issue of voluntariness. In fact, he contended that in the absence of a confidential relationship, there could be no finding that Grace had not executed the agreement voluntarily. We thus do not strike all but sections II and III of David's reply brief, as Grace urges, but rather strike all arguments that go beyond the scope of his opening brief and are not responsive to the arguments Grace presented in her respondent's brief, which arguments are interspersed throughout his reply brief.

50

At the time David and Grace executed the premarital agreement, section 1615 provided that such an agreement was unenforceable if the party against whom enforcement was sought proved either that he or she did not execute the agreement voluntarily or that the agreement was unconscionable and certain other circumstances applied. As to voluntariness, the California Supreme Court has said that the trial court should evaluate the evidence for coercion or lack of knowledge, which "may arise from the proximity of execution of the agreement to the wedding, or from surprise in the presentation of the agreement; the presence or absence of independent counsel or of an opportunity to consult independent counsel; inequality of bargaining power—in some cases indicated by the relative age and sophistication of the parties; whether there was full disclosure of assets; and the parties' understanding of the rights being waived under the agreement or at least their awareness of the intent of the agreement." (*In re Marriage of Bonds, supra,* 24 Cal.4th at p. 18.)[15] In light of these factors, substantial evidence supported Judge Burch's finding that Grace did not voluntarily execute the premarital agreement.

Grace testified that on the night before she and David were to fly out of town for their wedding, David and James presented the premarital agreement to her. According to Grace, she did not know what it was, but they assured her it was "no big deal" and it had to do with voting shares of Tharco. As Judge Burch put it, "Grace not only did not know the terms of the agreement but was, in effect, misled as to the importance of specific terms in the agreement that affected her rights." Further, Grace did not recall either David or James suggesting she have an attorney review it. She also testified that she

---

[15] In response to *In re Marriage of Bonds, supra,* 24 Cal.4th 1, the Legislature added subdivision (c) to section 1615. (Stats. 2001, ch. 286 § 2 (SB 78); *In re Marriage of Cadwell-Faso & Faso* (2011) 191 Cal.App.4th 945.) It details very specific requirements that a party seeking to enforce a premarital agreement must establish in order for a court to find that the agreement was voluntarily executed. That provision is inapplicable here, however, as the enforceability of a premarital agreement is governed by the law as it existed on the date of execution. (See *In re Marriage of Melissa* (2012) 212 Cal.App.4th 598, 611; Hogoboom & King, Cal. Practice Guide: Family Law, *supra,* ¶ 9:141.).)

trusted David and James, and was closer to James than she was to her own father. And as Judge Burch noted, "Grace testified, and neither David nor James disputed, that prior to the marriage she had in essence become part of David's family, living for a time with David's parents and vacationing with them. James Aitchison, David's father, testified that he cared for and treated Grace as if she were a daughter." In sum, there was ample evidence supporting Judge Burch's finding that Grace did not execute the agreement voluntarily: the timing of and the manner in which the agreement was presented to Grace, the fact that it was presented to her by two figures who had considerable influence over her, their misrepresentation (or lack of disclosure) concerning the effect of the agreement on her community property rights, Grace's young age, and her testimony that neither David nor James suggested she consult an attorney.[16]

In his final argument, David contends that Judge Burch committed reversible error by failing to respond to his questions concerning Grace's mental capacity, which questions were part of the 60 questions to which he sought answers in the statement of decision. There was no such error. As Judge Burch explained in his statement of decision, he was obligated to decide the dispositive issues by applying the pertinent legal principles to the facts of the case. He was not, as David suggested below and suggests again on appeal, required to make express findings on every disputed evidentiary point. (See *Muzquiz v. City of Emeryville* (2000) 79 Cal.App.4th 1106, 1125–1126; *Vukovich v. Radulovich* (1991) 235 Cal.App.3d 281, 295.) *Duff v. Duff* (1967) 256 Cal.App.2d 781, 785, on which David relies, is not to the contrary, as it merely affirms that the court must make findings on all material issues, which Judge Burch did here.

---

[16] We recognize that Judge Burch found Grace did not execute the agreement voluntarily because she and David were in a confidential relationship before they were married and he committed "a form of constructive fraud" in connection with the execution of the agreement. We need not address Judge Burch's confidential relationship finding, because we conclude that substantial evidence otherwise supported his finding of involuntariness. And we are tasked with reviewing the lower court's result, not its reasoning. (*Belair v. Riverside County Flood Control Dist.* (1988) 47 Cal.3d 550, 568; 9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, §346, p. 397.)

## DISPOSITION

The judgment of dissolution is affirmed, each side to bear its own costs on appeal.

                   _____

                   Richman, J.

We concur:

_____
Haerle, Acting P.J.

_____
Brick, J.[*]

---

[*] Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.